**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL LIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| FGL HOLDINGS, CHINH E. CHU, WILLIAM P. FOLEY, II, CHRISTOPHER O. BLUNT, KEITH W. ABELL, PATRICK S. BAIRD, MENES O. CHEE, RICHARD N. MASSEY, JAMES A. QUELLA and TIMOTHY M. WALSH, | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No.  1:20-cv-3144

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Michael Lin ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of FGL Holdings ("FGL" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with FGL, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between FGL and Fidelity National Financial, Inc. ("Fidelity").

2.     On February 7, 2020, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand

to receive $12.50 in cash or 0.2558 shares of Fidelity common stock for each share of FGL stock they own (the "Merger Consideration").

3.      On April 1, 2020, in order to convince FGL shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 (the "S-4") Registration Statement with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading S-4 violates SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) and Regulation G (17 C.F.R. § 244.100).

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that FGL shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by FGL's financial advisor, Houlihan Lokey Capital, Inc. ("Houlihan") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against

Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants'
violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9).
Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction
and taking any steps to consummate the Proposed Transaction unless, and until, the material
information discussed below is disclosed to FGL shareholders sufficiently in advance of the vote
on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover
damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange
Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges
violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant
conducts business in or maintains operations in this District, or is an individual who is either
present in this District for jurisdictional purposes or has sufficient minimum contacts with this
District as to render the exercise of jurisdiction over Defendant by this Court permissible under
traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §
78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took
place in this District and the Company's common stock trades on the New York Stock Exchange,
which is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of FGL common stock.

12.     Defendant FGL is incorporated in the Cayman Islands and maintains its principal

executive offices at 4th Floor, Boundary Hall, Cricket Square, Grand Cayman KY1-1102, Cayman Islands. The Company's common stock trades on the NYSE under the ticker symbol "FG."

13.     Individual Defendant Chinh E. Chu is FGL's Co-Chairman and has been a director of FGL at all relevant times.

14.     Individual Defendant William P. Foley, II is FGL's Co-Chairman and has been a director of FGL at all relevant times.

15.     Individual Defendant Christopher O. Blunt is FGL's Chief Executive Officer and President and has been a director of FGL at all relevant times.

16.     Individual Defendant Keith W. Abell has been a director of FGL at all relevant times.

17.     Individual Defendant Patrick S. Baird has been a director of FGL at all relevant times.

18.     Individual Defendant Menes O. Chee has been a director of FGL at all relevant times.

19.     Individual Defendant Richard N. Massey has been a director of FGL at all relevant times.

20.     Individual Defendant James A. Quella has been a director of FGL at all relevant times.

21.     Individual Defendant Timothy M. Walsh has been a director of FGL at all relevant times.

22.     The Individual Defendants referred to in paragraphs 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of FGL (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of April 1, 2020, there were approximately 222,000,000 shares of FGL common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of FGL will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

      i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

      ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

      iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

I.      **The Proposed Transaction**

25.     FGL offers various types of fixed annuities and life insurance products. The Company's most popular products are fixed index annuities that tie contractual returns to specific

market indices. These annuities allow holders to participate in the gains of the underlying market index while limiting the downside.

26.     On February 7, 2020, FGL and Fidelity issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> GEORGE TOWN, Cayman Islands, Feb. 7, 2020 /PRNewswire/ -- FGL Holdings (NYSE: FG) ("F&G" or the "Company"), a leading provider of fixed indexed annuities and life insurance, today announced that the Company has entered into a merger agreement pursuant to which Fidelity National Financial, Inc. (NYSE: FNF) ("FNF"), the leading provider of title insurance and closing and settlement services to the real estate and mortgage industries, will acquire F&G for $12.50 per share, representing an equity value of approximately $2.7 billion.
>
> The transaction was approved by a Special Committee of F&G Directors, a Special Committee of FNF Directors and the FNF Board of Directors. Under the terms of the merger agreement, holders of F&G's ordinary shares (other than FNF and its subsidiaries) may elect to receive either (i) $12.50 per share in cash or (ii) 0.2558 of a share of FNF common stock for each ordinary share of F&G they own. This is subject to an election and proration mechanism such that the aggregate consideration paid to such holders of F&G's ordinary shares will consist of approximately 60% cash and 40% FNF common stock.  Upon closing of the transaction, F&G shareholders will own approximately 7% of the outstanding shares of FNF common stock. This represents a premium of 28% to F&G's 60-day volume-weighted average price and a premium of 17% to F&G's all-time high closing stock price following its combination with CF Corp. of $10.70 prior to February 6, 2020, when the media reported a potential transaction.
>
> FNF currently owns 7.9% of F&G's outstanding ordinary shares and all of F&G's Series B Preferred shares, and, in connection with and immediately prior to the closing of the proposed acquisition, will acquire all outstanding F&G Series A preferred shares, with a face value of approximately $321 million as of December 31, 2019. Including the assumption of F&G's $550 million of senior notes due 2025, FNF's pro forma debt to total capital is expected to be approximately 26% at the close of the transaction.
>
> F&G is enhancing and extending its long-term investment management partnership with Blackstone, which, following the close of the transaction, will continue under FNF and includes Blackstone's world-class, embedded investment support functions. This agreement will continue to provide the Company with access to Blackstone's superior investment management and strategic oversight capabilities to drive additional value creation for F&G and policyholders, while continuing F&G's current focus on high-quality investment grade assets under the current F&G investment team.

"We are pleased to join forces with FNF, a world-class company we know well and respect," said Chris Blunt, President and CEO of FGL Holdings. "This agreement, which offers immediate value to F&G shareholders and compelling benefits to our stakeholders, will provide a meaningful platform for our business as we continue to build the F&G of the future. We are excited to enter into the next phase of growth with FNF and are confident that by combining our complementary businesses, we will be better positioned to carry out our mission of helping customers turn their aspirations into reality."

"We are incredibly proud of the significant transformation we have achieved since the 2017 CF Corp. transaction: a new world-class management team, accelerated sales growth, enhanced ROE, and doubling of AOI," said Chinh E. Chu, Co-Chairman of F&G. "We have tremendous respect for Bill Foley and FNF and are excited about this next chapter for F&G as the Company will have substantial opportunities to leverage FNF's scale and platform to accelerate value creation for shareholders."

**Strategic and Financial Benefits of the Transaction**

- Enhances financial strength and access to deployable capital to support growth.

- Improves ability to leverage FNF's institutional relationships with banks, providing an opportunity to accelerate F&G's entry into this channel.

- Maintains F&G's management team and unique, deep relationship with Blackstone. Blackstone has helped F&G successfully reposition its portfolio to achieve higher investment performance while minimizing risk and upgrading its financial strength rating.

- Leverages FNF's core expertise in capital allocation and operational excellence to augment infrastructure investments.

- Supports F&G's next phase of growth by benefitting from FNF's long-term strategic oversight and ownership track record of sector consolidation, capital allocation and value creation.

**Timing and Approvals**

The transaction is expected to close in the second or third quarter of 2020, subject to the satisfaction of customary closing conditions, including the receipt of regulatory clearances and approval by F&G shareholders.

Following the close of the transaction, F&G will operate as a subsidiary of FNF. F&G is expected to remain headquartered in Des Moines, Iowa, and will continue

to be led by Chris Blunt and F&G's current management team.

The terms of the merger agreement provide that F&G will be permitted, with the assistance of its legal and financial advisors, to actively solicit alternative acquisition proposals from third parties during a 40-day "go-shop" period from the date of the merger agreement until Wednesday, March 18, 2020. F&G may terminate the merger agreement to enter into a superior proposal with specified bidders identified in this period for a termination fee of $39,966,000, subject to the terms and conditions of the merger agreement. There is no guarantee that the "go-shop" process will result in any alternative acquisition proposal or that any alternative acquisition proposal will be identified at any time, or approved or completed. F&G does not intend to disclose developments with respect to the "go-shop" process unless and until F&G's Special Committee and/or F&G's Board of Directors makes a determination requiring further disclosure.

27.     FGL is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.     If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading S-4

29.     On April 1, 2020, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain

any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### The Materiality of Financial Projections

30.    A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses that "certain financial forecasts were prepared by FGL's management and made available to the FGL special committee, Credit Suisse and Houlihan Lokey in connection with the FGL special committee's exploration of strategic alternatives." S-4 106.

31.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

32.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

33.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

34.     Here, FGL's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it. S-4 90-91.

35.     As discussed further below, the non-GAAP financial projections used do not provide FGL's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

*The Financial Projections Relied on by the Board*

36.     The S-4 discloses that "certain financial forecasts were prepared by FGL's management and made available to the FGL special committee, Credit Suisse and Houlihan Lokey in connection with the FGL special committee's exploration of strategic alternatives." *Id.* at 106.

37.     The S-4 goes on to disclose, *inter alia*, FGL's forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2023 for Adjusted Operating Income Available to Common Shareholders, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures.  *Id.* at 107-08.

38.     The S-4 defines Adjusted Operating Income Available to Common Shareholders as "adjusting net income (loss) available to common shareholders to eliminate: (i) the impact of net investment gains/losses, including other than temporary impairment ("OTTI") losses recognized in operations, but excluding realized gains and losses on derivatives hedging FGL's indexed annuity policies, (ii) the impacts related to changes in the fair values of FIA related derivatives and embedded derivatives, net of hedging cost, and the fair value accounting impacts of assumed reinsurance by FGL's international subsidiaries, (iii) the tax effect of affiliated reinsurance embedded derivative, (iv) the effect of change in fair value of the reinsurance related embedded derivative, (v) the effect of integration, merger related & other non-operating items, (vi) impact of extinguishment of debt, and (vii) net impact from Tax Cuts and Jobs Act."  *Id.* at 108 n.1. Nevertheless, the S-4 fails to reconcile Adjusted Operating Income Available to Common Shareholders to its most comparable GAAP measure or disclose the line items used to calculate Adjusted Operating Income Available to Common Shareholders, rendering the S-4 materially false and/or misleading.  *Id.*

39.     Thus, the S-4's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

40.     The non-GAAP financial projections disclosed on pages 107-08 of the S-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

41.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

42.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

43.    Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

44.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]    Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as FGL included in the S-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant,

---

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]    SEC, *Final Rule.*

[5]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

45.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

---

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4.

46.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4 into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

47.     In addition to the S-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

48.     Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that "[n]on-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by FGL may not be comparable to similarly titled amounts used by other companies." S-4 107.

---

The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.    The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Apr. 20, 2019).

49.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

50.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 107-08, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

51.     The summary of the valuation methodologies utilized by Houlihan, including the utilization of certain of the non-GAAP financial projections described above by Houlihan, in connection with its valuation analyses (*id.* at 96-97) is misleading in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once an S-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

52.     With respect to Houlihan's prior relationships with FGL and Fidelity, the S-4 fails to disclose how much Houlihan was compensated for its prior services provided to FGL or what, if any, past services have been provided to Fidelity and its affiliates. *Id.* at 104.

53.     With respect to Houlihan's *Discounted Cash Flow Analysis*, Houlihan calculated the estimated net present value of the projected dividends to ordinary shareholders of FGL for the fiscal years 2020 to 2023, and the estimated net present value of the terminal value of FGL. *Id.* at 102. Houlihan calculated FGL's terminal value by applying a terminal value multiple range of 7.5x to 8.5x to FGL's estimated 2023 Adjusted Net Income and a terminal value multiple range of 1.25x to 1.45x to FGL's book value as of December 31, 2023, based on the management projections. *Id.* at 102-03. Houlihan discounted the projected future cash flows and terminal values using a discount rate range of 10.0% to 12.0%, based on the Company's cost of equity. *Id.* at 103.

54.     The S-4 fails to disclose the projected dividends to ordinary shareholders, the projected future cash flows and the line items used to calculate the future cash flows, the calculated range of terminal values, the inputs and assumptions used to select the Adjusted Net Income terminal multiple range and the book value terminal multiple range, the Company's forecasted 2023 Adjusted Net Income, the inputs used to calculate the Company's cost of equity, whether any adjustments were made or the number of fully diluted shares outstanding.

55.     Since information was omitted, shareholders are unable to discern the veracity of Houlihan's discounted cash flow analysis. Without further disclosure, shareholders are unable to compare Houlihan's calculations with the Company's financial projections.  The absence of any single piece of the above information renders Houlihan's discounted cash flow analysis incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

56.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ."  *Id*. (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

57.     Additionally, FGL engaged two additional advisors: Credit Suisse as an additional financial advisor and CC Capital Partners, LLC ("CC Capital") as a transaction advisor.

58.     With respect to Credit Suisse's past relationships with FGL and Fidelity, the S-4 fails to disclose the compensation received for its prior services performed for FGL and its predecessor company or what, if any, prior services have been performed for Fidelity and its affiliates.

59.     With respect to CC Capital's past relationships with FGL and Fidelity, the S-4 fails to disclose if CC Capital has performed any past services for Fidelity, and if so, the amount of compensation received. This information is particularly important because CC Capital is an entity controlled by Chinh Chu, FGL's Co-Chairman. *Id*. at 106. When conflicted parties are involved, full disclosure of prior relationships is required to ensure shareholders have been fully represented and are receiving fair compensation for their shares.

60.     Therefore, in order for FGL shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

61.     In sum, the S-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from FGL shareholders.

62.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

63.     Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

64.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

66.     As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other

things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

67.     The failure to reconcile the non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

68.     As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and
Rule 14a-9 Promulgated Thereunder)**

69.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

71.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that

measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

72.     Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

73.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

74.     The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

75.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

76.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing

materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

77.    FGL is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

78.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

79.    As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

### COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

80.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

81.    The Individual Defendants acted as controlling persons of FGL within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors

and/or officers of FGL, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

82.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the S-4.

84.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

85.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

86.     As set forth above, the Individual Defendants had the ability to exercise control

over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 20, 2020

Respectfully submitted,

By: */s/ James M. Wilson, Jr.*

Nadeem Faruqi
James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Michael Lin ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against FGL Holdings ("FGL") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in FGL securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 17th day of April, 2020.

Michael Lin

| Transaction<br>(Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 06/03/19 | 450 |
|  |  |  |
|  |  |  |